**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **SUSAN I. NWOGA,** | * | |
| **Petitioner,** | * | |
| **v.** | * | **Civ. No. DLB-22-3299** |
| **WARDEN,** *et al.*, | * | |
| **Respondents.** | * | |

<u>**MEMORANDUM OPINION**</u>

Susan I. Nwoga filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF 1, 3. The respondents filed an answer to the petition, asserting it must be dismissed because the claims either lack merit or are procedurally defaulted. ECF 10. No hearing is necessary. *See* Rule 8(a), *Rules Governing § 2254 Cases in the U.S. Dist. Cts.*; Loc. R. 105.6 (D. Md. 2025); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the following reasons, the petition is dismissed in part and denied in part, and a certificate of appealability shall not issue.

## I.    BACKGROUND

On April 24, 2018, Nwoga was indicted in the Circuit Court for Baltimore City on 320 counts, including charges of Medicaid fraud, theft of over $100,000, and distribution of controlled dangerous substances ("CDS"). ECF 10-1, at 88, 322. According to the Appellate Court of Maryland, the following facts were adduced at trial:

> The State's theory of the case was that Nwoga, a licensed pharmacist, participated in a drug distribution scheme by filling hundreds of false prescriptions for medications containing opioids and other [CDS, that is, substances listed in Md. Code Ann., Crim. Law §§ 5-402 – 5-406]. She fraudulently billed Maryland's Medicaid program for these medications and received hundreds of thousands of

dollars in reimbursements. Although the evidence produced at trial in this case was voluminous, the underlying facts were largely uncontested.

Beginning in 2012 and ending in 2016, Nwoga operated the Poplar Grove Pharmacy in Baltimore. She was Poplar Grove's sole pharmacist and filled thousands of prescriptions for medications containing [CDS]. Under the relevant federal and state regulations, pharmacists must ensure that [CDS] prescriptions are written for legitimate medical purposes by physicians or other health professionals acting within the normal scope of their professional practices. [*See* Md. Code Regs. 10.34.20.02 (requirements for how prescriptions are conveyed to pharmacists).] A pharmacist is also required to exercise her professional judgment to assess the validity of each prescription for CDS medication before filling it.

Poplar Grove was a Medicaid provider. As part of the agreement to become a Medicaid provider, Poplar Grove agreed to comply with all federal and state laws and regulations, administrative policies and guidelines issued by the Food and Drug Administration and the Maryland Department of Health, including filing accurate and truthful claims submitted to the Department for reimbursement. All pharmacies are subject to periodic inspections by agents of the Department of Health's Division of Drug Control (the "DDC") [now called the Office of Controlled Substance Administration].

In 2012, DDC inspector Peter Smith reviewed Poplar Grove's records for CDS prescriptions and discovered "seven or eight" apparently fraudulent prescriptions as well as discrepancies in Nwoga's record-keeping. He discussed these problems with her.

In May 2013, Smith and James Polek, the Deputy Director of the DDC, conducted another inspection. They uncovered a large number of apparently fraudulent CDS prescriptions. The prescriptions contained errors in the security features and/or the accompanying physician's directions as to dosage were unusual. For example, the directions on some prescriptions directed the ultimate user to take the medicine every 46 or 68 hours, instead of four to six or six to eight hours and the same errors appeared on prescriptions from different physicians. In other prescriptions, the first and last names of the prescribing physician were transposed.

Polek and Smith contacted the prescribing physicians to verify the legitimacy of the prescriptions. This led the inspectors to conclude that 260 prescriptions appeared to be fraudulent, which was an extremely high number for a pharmacy. Polek discussed his findings with Nwoga and explained to her why these prescriptions were suspicious and probably fraudulent. He provided her with a list of "red flags," that is, indicators that a prescription was potentially fraudulent.[1] He

---

[1] The red flags included: "cocktail prescriptions," that is, multiple prescriptions for [CDS] to the same patient and the same time; prescriptions paid for in cash; prescriptions for high strengths or large quantities of CDS medications; unusual distances between the patient, the prescriber, and/or the pharmacy; a prescription

2

warned her that the presence of one or more red flags should cause her to exercise her due diligence to make sure that the prescription was legitimate.

In their 2014 inspection of Nwoga's records, Smith and Polek uncovered 62 fraudulent prescriptions. Once again, Polek provided Nwoga with a report explaining the "red flags" uncovered in the inspection.

The last inspection was not a routine one. The Department of Health received a complaint that a Darnella Carter [a co-defendant who was tried separately] and a staff member of a methadone clinic were obtaining drugs from Nwoga by means of fraudulent prescriptions. Polek reviewed Poplar Grove's records and found that the pharmacy had filled prescriptions for Carter. The DDC then subpoenaed records for all of Poplar Grove's prescriptions for medications containing [CDS] that were filled between January 1, 2012, and September 24, 2015, approximately 6,000 prescriptions in total. Polek did not complete his analysis of these records—he stopped after finding 748 fraudulent prescriptions. As a result of the information uncovered by the investigation, Nwoga was charged with a total of 320 counts of theft, fraud and drug distribution.

At the trial, the State introduced physical and testimonial evidence. It first produced the HIPAA logs that Nwoga maintained at her pharmacy. These logs contained information about the prescriptions filled by Nwoga and the signatures of the persons who had picked them up. The State matched this information with claims that Poplar Grove submitted to Medicaid.

Polek, who was qualified as an expert witness, testified that the 2015 inspection showed an "overwhelming presence of fraudulent activity." He also noted that Nwoga had shown him seven prescriptions that she did not fill because she thought they were fraudulent. Polek told the court that if Nwoga had been "able to spot those," then she should have been able to identify the other fraudulent prescriptions.

Additionally, the State called as witnesses five physicians and one physician's assistant who purportedly issued the prescriptions that were referenced in the indictment. They testified that they had not written the prescriptions in question, that none of those who signed the HIPAA logs were in fact their patients, that Nwoga had never reached out to them to verify the prescriptions, and that many of the prescriptions themselves had glaring issues. These problems included prescriptions that lacked the patient's date of birth or address, prescriptions for

---

being filled too soon; multiple family members receiving prescriptions for the same CDS medications; prescriptions for the same drugs to more than one person at the same address; and error in directions for dosages and usage.

ECF 10-1, at 326 n.6.

unusually high dosages or amounts of medication, and prescriptions for multiple opiates for the same patient on the same day.

In addition to the testimony of Polek, Smith, and the health care providers, the State also called Todd Sheffer, an investigator and auditor for the Medicaid Fraud Control Unit of the Office of the Attorney General. Sheffer concluded that the State had paid Nwoga $365,131.68 as reimbursement for the fraudulent prescriptions purportedly issued by the health care providers who testified at trial. The State also introduced voluminous documentary exhibits to support the testimony.

Nwoga testified in her own defense. She did not deny that she had filled the prescriptions that the State alleged were fraudulent. She asserted that she had done so because she believed that they were legitimate. According to Nwoga, before she opened Poplar Grove, she had worked in suburban pharmacies where fraudulent prescriptions were not an issue. She was naive, credulous, and, as the only pharmacist at Poplar Grove, was, in her lawyer's words, "easy pickings" for sophisticated groups of criminals looking to get these drugs.

Nwoga confirmed that nearly 98% of her patients were Medicaid recipients. And she admitted that without the payments she received from Medicaid, she would have been forced to close Poplar Grove within a matter of weeks. Nwoga testified that she often took a financial loss by filling prescriptions for CDS covered by Medicaid, so she had no reason to defraud or steal from the program.

To support this argument, her counsel introduced Nwoga's accounting logs for Poplar Grove into evidence. Those logs were kept by a third-party vendor, Best Rx. And because Nwoga was the sole pharmacist at Poplar Grove, only she entered information into the logs.

According to those logs, Nwoga filled, distributed, submitted a claim to, and received a payment from Medicaid for each of the fraudulent prescriptions at issue. The logs noted the type and quantity of medication Nwoga filled for each prescription, how much Medicaid paid Nwoga for filling each prescription, and had Nwoga's initials next to each of the prescriptions showing that she had filled them.

Based on this evidence, the trial court convicted Nwoga of one count of Medicaid fraud, one count of theft of over $100,000 and 287 counts of distribution of CDS.

ECF 10-1, at 324–29 (footnotes omitted).

On May 21, 2019, the state trial court sentenced Nwoga to an aggregate sentence of five years' incarceration, with 20 years suspended and five years of probation. ECF 10-9, at 57. She was ordered to pay $507,433.46 in restitution. ECF 10-11.

4

Nwoga appealed her conviction to the Appellate Court of Maryland. ECF 10-1, at 183–239. She asserted that there was insufficient evidence to support her convictions for distribution of CDS, Medicaid fraud, and theft. *Id.* at 184. She also argued that the trial court abused its discretion by not appointing counsel for her and not affording her additional time to retain counsel. *Id.* And, she contended that the restitution order exceeded what the evidence supported. *Id.* On February 17, 2021, the Appellate Court of Maryland affirmed Nwoga's conviction and the restitution order. *Id.* at 322–42. The Supreme Court of Maryland subsequently denied Nwoga's petition for a writ of certiorari. *Id.* at 367–409.

On February 22, 2021, Nwoga, without counsel, filed a petition for postconviction review. *Id.* at 343–37. Nwoga claimed that she was entitled to relief because her attorneys had an actual conflict of interest due to their representation of Brent Matthews, who could have been an exculpatory witness for Nwoga but whom her attorneys failed to call as a witness. *Id.* at 345–46. She claimed she also was entitled to relief due to "prosecutorial misconduct and selective prosecution" because the government could have prosecuted "similarly situated people" but did not. *Id.* at 346. And, she sought relief based on "new evidence following [her] conviction." *Id.* at 346–55. The court appointed counsel for Nwoga, and counsel amended her petition on February 11, 2022, elaborating on the conflict-of-interest claims, *id.* at 459–66, and adding an ineffective assistance of counsel claim based on counsel's failure to interview exculpatory witnesses before trial and failure to call them as witnesses at trial, *id.* at 466–78. The uncalled witnesses included Desia Holt, Darnella Carter (referred to as Daniella Carter in ECF 3), Antoinette Johnson, and DEA agents. *Id.* at 466–78.

The postconviction court held a hearing on April 6, 2022. ECF 10-12. Nwoga, both of her trial attorneys, and one of the prosecutors testified. *Id.* On June 10, 2022, the postconviction court

denied Nwoga's petition. *Id.* at 483–508. The Appellate Court of Maryland subsequently denied Nwoga's application for leave to appeal. *Id*. at 509–56.

On December 21, 2022, Nwoga filed her initial petition for a writ of habeas corpus in this Court, alleging her trial attorney had an actual conflict of interest and provided ineffective assistance of counsel because he failed to call exculpatory witnesses. ECF 1, at 23–38. In her supplemental petition, ECF 3, she alleges four grounds for habeas relief:

(1) Three forms of prosecutorial misconduct: (a) fabrication and destruction of evidence akin to the prosecutorial misconduct that led to the dismissal of criminal charges in *Annappareddy v. Pascale*, No. GLR-13-cr-374 (D. Md.), ECF 3, at 70–78; (b) false statements in a press release, *id.* at 78–79; and (c) the withholding of exculpatory evidence, *id.* at 79–80.

(2) Two conflicts of interest, namely her attorney Richard Karceski and his firm Silverman Thompson represented prosecutor Catherine Pascale in the *Annaparreddy* case at the same time they represented Nwoga, and they also represented potential exculpatory witness Brent Matthews, *id.* at 80–86.

(3) Ineffective assistance of counsel because counsel failed to call exculpatory witnesses Desia Holt, Antoinette Johnson, Darnella Carter, and DEA agents; made a secret deal with the prosecutors not to call witnesses; failed to read or obtain the police report; and failed to obtain a forensic financial analysis, *id.* at 86–92.

(4) Double jeopardy based on a Board of Pharmacy hearing and sanction and a case before the Office of Administrative Hearings, *id.* at 92–94.[2]

---

[2] In her petition, which she filed without counsel, Nwoga does not list or describe her claims in the manner the Court does here. The Court has done its best to accurately identify and clearly summarize her claims.

The respondents filed a limited answer to the petition, arguing that Grounds 1 and 4 and some of the claims in Grounds 2 and 3 are procedurally defaulted because they were not presented to the state courts. ECF 10, at 38–39, 47–50, 51–56, 66–69, 98–100. Nwoga filed a second supplement to her petition, asserting an actual innocence claim, ECF 11, and a reply to the respondents' limited answer, ECF 12.

## II.    Exhaustion and Procedural Default

### A.    Procedural Requirements

A petitioner seeking relief under § 2254 first must exhaust each of their claims in state court. 28 U.S.C. § 2254(b), (c); *see also Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973); *Mallory v. Smith*, 27 F.3d 991, 994 (4th Cir. 1994) (petitioner bears the burden of demonstrating state remedies have been exhausted). This exhaustion requirement is satisfied by seeking review of each claim in the highest state court with jurisdiction to consider it. For a person convicted of a criminal offense in Maryland, this may be accomplished either on direct appeal or in post-conviction proceedings.

A petitioner can exhaust a claim on direct appeal by asserting the claim in an appeal to the Appellate Court of Maryland and, if the appeal is denied, in a petition for a writ of certiorari to the Supreme Court of Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301.

Additionally, for claims that are not appropriate for relief on direct appeal, the petitioner must pursue state post-conviction proceedings. To exhaust a claim through that avenue, the petitioner must raise the claim in a petition to the state circuit court where they were convicted and, if unsuccessful, the petitioner must raise the claim in an application for leave to appeal to the Appellate Court of Maryland. *See* Md. Code Ann., Crim. Proc. § 7-109. If the appellate court denies the application, there is no further review available, and the claim is exhausted. *See* Cts. &

Jud. Proc. § 12-202(1). However, if the application is granted but relief on the merits of the claim is denied, the petitioner must file a petition for writ of certiorari to the Supreme Court of Maryland. *See Williams v. State*, 438 A.2d 1301, 1305 (Md. 1981).

Procedural default occurs when the petitioner failed to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim due to a procedural bar. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted."). "[I]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard*, 134 F.3d at 619 (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)).

The court "may only review procedurally defaulted claims to determine whether the petitioner has shown that he falls within an exception" that permits review of the claim's merits. *Richardson v. Kornegay*, 3 F.4th 687, 695 (4th Cir. 2021). The two recognized exceptions require the petitioner to demonstrate "cause and prejudice, or actual innocence." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010). "Cause" consists of "some objective factor external to the defense [that] impeded [ ] efforts to comply with the State's procedural rule[.]" *Wolfe v. Johnson*, 565 F.3d 140, 158 n.27 (4th Cir. 2009) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "Prejudice" is established when a petitioner demonstrates that "errors at his trial . . . worked to his

*actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions[.]" *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Actual innocence, recognized as a "fundamental miscarriage of justice," is established when a petitioner shows, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him[.]" *United States v. Herrera-Pagoada*, 14 F.4th 311, 319 (4th Cir. 2021) (quoting *Bousely v. United States*, 523 U.S. 614, 623 (1998)).

**B.      Unexhausted Claims**

The respondents argue that the prosecutorial misconduct claims in Ground 1, the conflict-of-interest claim in Ground 2 based on her counsel's representation of Pascale, three of the ineffective assistance of counsel claims in Ground 3, and the double jeopardy claims in Ground 4 are unexhausted because Nwoga failed to assert these claims in state court. ECF 10, at 38–39, 47–50, 51–56, 66–69, 98–100.

On direct appeal, Nwoga did not raise any of the claims she asserts in her habeas petition. ECF 10-1, at 183–239. So she did not exhaust her habeas claims on direct appeal.

In her postconviction proceedings, Nwoga identified four discrete claims: (1) prosecutorial misconduct for selective prosecution; (2) trial counsel's conflict of interest; (3) new evidence; and (4) ineffective assistance of counsel because counsel failed to call certain witnesses. ECF 10-1, at 343–57, 441–82; ECF 10-2, at 9–10. The alleged prosecutorial misconduct in Nwoga's postconviction petition is different than the prosecutorial misconduct in Ground 1 of her habeas petition. In her postconviction petition, she alleged that the prosecutors could have prosecuted "similarly situated people" but chose only to prosecute her. ECF 10-1, at 346. In her habeas petition, she alleges that the prosecutors fabricated and destroyed evidence like the prosecutors allegedly did in *Annappareddy*, made false statements in a press release, and withheld exculpatory

evidence. ECF 3, at 70–80. Nwoga did not raise any of these prosecutorial misconduct claims in her postconviction petition. These claims are unexhausted.

One of Nwoga's conflict-of-interest claims in Ground 2 of her habeas petition also is unexhausted. In her postconviction petition, she alleged her trial counsel had a conflict of interest due to their representation of Brent Matthews. ECF 10-1, at 345–46, 459–66. Her conflict-of-interest claim in her habeas petition is about counsel's representation of Matthews and Catherine Pascale. ECF 3, at 80–83. Her claim about the representation of Matthews is exhausted. But, because Nwoga never raised a conflict-of-interest claim based on her trial counsel's representation of Pascale, this claim in Ground 2 is unexhausted.[3]

Some of the claims in Ground 3 are exhausted. In her postconviction petition, Nwoga claimed that her counsel was ineffective for failing to call certain witnesses, including Desia Holt, Darnella Carter, Antoinette Johnson, and DEA agents. ECF 10-1, at 466–78; ECF 3, at 86–92. She asserts this same claim in Ground 3; it is exhausted. But the other claims in Ground 3—that her counsel was ineffective for making a secret deal with prosecutors not to call witnesses, for failing to read or obtain a police report, and for failing to secure a forensic financial analysis—were not raised in her postconviction petition and are not exhausted.

Lastly, Nwoga includes two double jeopardy claims as Ground 4 of her habeas petition. She did not raise a double jeopardy claim in her original postconviction petition, in her supplemental petition filed by counsel, or during the postconviction hearing. ECF 10-1, at 343–57, 441–82; ECF 10-12. These claims are unexhausted.

---

[3] Nwoga also discusses counsel's representation of Maura Lating. To the extent Nwoga claims ineffective assistance based on this representation, the claim is unexhausted and procedurally defaulted.

In sum, the record reflects that Nwoga did not raise on direct appeal or in a postconviction petition the prosecutorial misconduct claims in Ground 1, the conflict-of-interest claim based on representation of Pascale in Ground 2, three of the ineffective assistance of counsel claims in Ground 3, and the double jeopardy claims in Ground 4. They are unexhausted.

### C.  Procedurally Defaulted Claims

The respondents argue that these claims are not only unexhausted but also procedurally defaulted because Nwoga no longer can raise them in state court. Nwoga already filed a direct appeal and a postconviction petition in state court. Maryland does not permit a second state petition for postconviction relief. *See* Crim. Proc. § 7-103(a). Nwoga may no longer raise these claims in state court. They are procedurally defaulted.

Neither exception to the procedural default bar applies here. Nwoga does not argue that she had cause for failing to raise these claims in state court. So the "cause and prejudice" exception to the procedural default rule does not apply here.

Nwoga appears to argue that the actual innocence exception to the procedural default rule applies. After the respondent pointed out that she had procedurally defaulted on several of her habeas claims, Nwoga filed a "Petition for Actual Innocence Based on Non-Biological Evidence," ECF 11, which the Court construes as a request to excuse her procedural default through the actual innocence gateway. *See Teleguz v. Pearson*, 689 F.3d 322, 327–28 (4th Cir. 2012) ("[A]ctual innocence . . . is a procedural mechanism rather than a substantive claim . . . . In other words, although a petitioner claims actual innocence . . . , this innocence claim 'does not by itself provide a basis for relief. Instead, his claim for relief relies critically on the validity' of his procedurally defaulted claims." (quoting *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010))).

"[T]enable actual-innocence gateway pleas are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. The gateway actual innocence "standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (citation omitted); *see, e.g., McQuiggin*, 569 U.S. at 401 ("We stress once again that the [actual innocence] standard is demanding."); *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) ("Claims of actual innocence . . . presented . . . as gateways to excuse a procedural default . . . should not be granted casually.").

Nwoga asserts that she is actually innocent and was convicted only because the state falsified evidence, targeted her as an immigrant, and destroyed evidence in her case. ECF 11, at 8–18. She insists that the evidence attached to her habeas petition and her reply to the respondents' answer (ECF 1-1 – 1-4, 3-1, 12-1 – 12-26) proves her actual innocence, ECF 11, at 2, but she does not direct the Court to any particular evidence. Rather, Nwoga contends "[t]he DEA told the government [she] was innocent" and "suggested" that the prosecution "drop[] the case," ECF 11, at 8, but she does not submit evidence to support this contention. She also argues—again without identifying supporting evidence—that "[t]he DEA were the only ones who collected all the evidence and sent confidential informants to trap Ms. Nwoga," and "[t]he DEA investigated Ms. Nwoga from 2013 – 2018 and they found she obeyed every law and refused to fill fake prescriptions." *Id*. According to Nwoga, "the government failed to present DEA's findings, relying

12

instead on error filled reports" and "manufactured evidence," and "to this day [the prosecution is] refusing to turn over documents that will prove Ms. Nwoga's innocence." *Id.* at 9. She states that she "always suspected that the Respondents never had a police report, and presented false evidence to the grand jury, if there was a grand jury held." *Id.*

These unsupported arguments and suspicions fall well short of the demanding standard for an actual innocence gateway claim. Conclusory, unsubstantiated allegations of innocence are hardly the sort of new, reliable evidence deemed necessary by the Supreme Court. *See Schlup*, 513 U.S. at 324. Moreover, in light of the ample evidence supporting her conviction, *see* ECF 10-1, at 324–29, Nwoga has failed to show that even upon consideration of the evidence she refers to but has not submitted, "no juror acting reasonably would have voted to find [her] guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386. Nwoga has failed to meet the standard for actual innocence to excuse the procedural default.

## III.     Standard of Review

A state prisoner's application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Section 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet" and requires reviewing courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v. Woodall*, 572 U.S. 415, 419–20 (2014) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement") (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

13

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state's adjudication is contrary to clearly established federal law under § 2254(d)(1) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (quoting *Williams*, 529 U.S. at 410) (emphasis removed). "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S 766, 773 (2010).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–342 (2006)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

## IV.   Discussion

### A.   Sixth Amendment Right to Conflict-Free Counsel (Ground 2)

Nwoga contends that her Sixth Amendment right to conflict-free counsel was violated because her trial counsel's law firm represented her while simultaneously representing a potential witness in her case, Brent Matthews, in a civil rights lawsuit against the Baltimore Police Department Gun Trace Task Force Unit. ECF 3, at 83–86.

"A criminal defendant has both the Sixth Amendment right to conflict-free counsel and the ability to waive that right." *Stanko v. Stirling*, 109 F.4th 681, 691 (4th Cir. 2024) (internal citations omitted), *cert. denied,* 145 S. Ct. 2685 (2025). "A defendant may waive his right to conflict-free representation, provided that the waiver is knowing, intelligent, and voluntary." *United States v. Akinseye*, 802 F.2d 740, 744–45 (4th Cir. 1986) (internal citations omitted). To establish a deprivation of their constitutional right to conflict-free assistance of counsel, a habeas petitioner must show that they did not intentionally, knowingly, and voluntarily relinquish this right. *See Hoffman v. Leeke*, 903 F.2d 280, 288 (4th Cir. 1990) (citing *Johnson v. Zerbst*, 304 U.S. 458, 468–69 (1938)). "[T]he *possibility* of conflict is insufficient to impugn a criminal conviction." *Cuyler*

15

*v. Sullivan*, 446 U.S. 335, 350 (1980) (emphasis added). If the petitioner did not object to the conflict at trial, they "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348. If the petitioner can prove that their attorney had an actual conflict of interest and that the attorney's conflict adversely affected their representation, prejudice to the client is presumed. *Strickland v. Washington*, 466 U.S. 668, 692 (1984) (citing *Cuyler*, 446 U.S. at 348–50). "Adverse effect cannot be presumed," however, "from the mere existence of a conflict of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002).

A habeas petitioner demonstrates an actual conflict when they show that their counsel "actively represented conflicting interests." *Cuyler*, 446 U.S. at 350. A conflict compromises an attorney's representation "when an attorney takes action for one client that is necessarily adverse to another, or when an attorney fails to take action for one client for fear of injuring another." *Jones v. Polk*, 401 F.3d 257, 267 (4th Cir. 2005). The Court applies a three-factor test to determine whether a conflict adversely affected the representation:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. [To demonstrate objective reasonableness,] the petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Mickens*, 240 F.3d at 361 (en banc) (internal citation omitted) (quoting *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991)).

Nwoga argues her trial counsel's law firm represented her at trial while simultaneously representing a potential witness in her case, Brent Matthews, in a civil rights lawsuit against the Baltimore Police Department Gun Trace Task Force Unit. Nwoga testified at the postconviction hearing that Matthews was a customer of the Poplar Grove Pharmacy. ECF 10-12, at 17. She also

testified that she advised her attorneys at their first meeting that she was aware of Matthews's lawsuit from an article in the *Baltimore Sun* and that her lawyer, Richard Karceski, admitted that the law firm represented Matthews. *Id.* Nwoga believed that Matthews would provide favorable testimony at her trial because he would testify that he got the same prescriptions filled at big chain pharmacies. *Id.* at 20.

Karceksi testified that he learned about Matthews's involvement in Nwoga's case when he received discovery from the Attorney General's Office that included an interview with Matthews. *Id.* at 78–79. *Id.* at 81. Karcaski testified that Matthews said he made fake prescriptions, passed them at Poplar Grove, and knew that Nwoga was not verifying the prescriptions because the phone numbers on the prescriptions were fabricated. *Id.* at 81. Karceski considered Matthews's statement to be "very damning" and testified that he would not have called Matthews as a witness. *Id.* at 81, 83. Karceski also testified that Matthews's civil rights lawsuit, in which Karceski's firm represented Matthews, was brought up with Nwoga on a "number of occasions." *Id.* at 78, 82. According to Karceski, he discussed the options with Nwoga, and she elected to have the firm continue to represent her. *Id.* at 82–84.

Karceski's co-counsel, Howard Schulman, also testified at the postconviction hearing. *Id.* at 102–21. Schulman worked for a different law firm than Karceski, and Nwoga initially retained Shulman to represent her before the Maryland Board of Pharmacy. *Id.* at 103, 106. Schulman recommended that Nwoga also retain Karceski because of his criminal trial experience. *Id.* at 104. Schulman recognized that Nwoga believed Matthews would have given favorable testimony because some of his fake prescriptions were filled at other pharmacies, but he shared Karceski's opinion that Matthews was not helpful to Nwoga's defense. *Id.* at 110, 111.

17

Karceski testified that he presented the conflict-of-interest waiver to Nwoga in a February 1, 2019 letter explaining that, in an "unrelated civil litigation matter," the law firm of Silverman, Thompson, Slutkin, and White simultaneously represented Matthews, whom the prosecution could call as a witness at trial. ECF 10-1, at 481–82. In the letter, Karceski explained that if the prosecution called Matthews as a witness, "cross examination of him in [Nwoga's] case, as well as [Karceski's] firm's representation of him in the unrelated civil litigation matter, is a potential conflict of interest" and that Karceski "plan[ned] to have an outside criminal defense lawyer cross-examine Mr. Matthews at [Nwoga's] trial." *Id.* Karceski also offered to pay for independent counsel to meet with Nwoga to discuss the potential ramifications of the conflict. *Id.* Nwoga's signature appears at the end of the letter, indicating a waiver of the conflict. *Id.* at 482. Nwoga testified that the only reason she signed the conflict-of-interest waiver was because her lawyers presented it to her the Friday before her trial commenced. ECF 10-12, at 18.

After hearing the testimony and reviewing the evidence, the postconviction court denied relief on the conflict-of-interest claim. ECF 10-1, at 345–46, 459–66, 504–05. The court found that counsel's decision not to call Matthews was a reasonable trial strategy because Matthew's interview demonstrated that his cross-examination would have been very harmful to Nwoga. *Id.* at 504. Additionally, the postconviction court found that Nwoga could not show prejudice because "five doctors and one physician's assistant testified that hundreds of prescriptions filled by Petitioner were fraudulent." *Id.* at 505. The postconviction court also found that Nwoga voluntarily signed a waiver of the conflict of interest. *Id.*

Nwoga has failed to show that the postconviction court's conclusion that she freely and voluntarily waived her right to conflict-free counsel is contrary to or an unreasonable application of federal law. The record reflects that Nwoga was aware of her counsel's representation of

18

Matthews as early as her first meeting with him, counsel explained the drawbacks of the potential conflict verbally and in writing, and Nwoga knowingly, voluntarily, and intelligently chose to waive the conflict and retain Karceski as her trial counsel.

Nwoga also has failed to show that any conflict compromised her attorney's representation. Nwoga insists that calling Matthews as a defense witness was a plausible alternative defense strategy and that Karceski did not call him because Karceski's firm represented Matthews in a civil suit. The record demonstrates otherwise. Both Karceski and Schulman testified that the discovery materials provided by the Attorney General's Office revealed that Matthews would have been a damaging witness for the defense. Indeed, the defense strategy was that Nwoga lacked criminal intent. ECF 10-12, at 97–98, 131. Nwoga's trial counsel testified that Matthews's interview would have provided evidence that contradicted that defense. According to their testimony, Matthews's interview indicated that Matthews would have testified that Nwoga actively ignored red flags on the fake prescriptions. *Id.* at 81, 83, 110–11. This testimony would have been particularly damning because the state did not call any witnesses who passed fake prescriptions at Nwoga's pharmacy. *See* ECF 10-2, 10-3, 10-4, 10-5, 10-6. If Nwoga had called Matthews, his testimony on cross-examination would have bolstered the state's case. Moreover, Matthews' testimony could have undermined Nwoga's testimony that she had no idea the prescriptions were fake and that she made every effort to verify the authenticity of prescriptions. ECF 10-6, at 26-223; ECF 10-7, at 4-142. Far from harming Nwoga, Nwoga's counsel decision to not call Matthews protected her. The decision made in her best interest.

Nwoga's petition for habeas relief based on a violation of her Sixth Amendment right to conflict-free counsel (Ground 2) is denied.

**B.**     **Ineffective Assistance of Counsel based on a Failure to Call Exculpatory Witnesses (Ground 3)**

Nwoga contends that her trial counsel was ineffective because counsel did not call Desia Holt, Antoinette Johnson, Darnella Carter, and DEA agents as witnesses at trial. ECF 3, at 89–92. Nwoga insists these witnesses would have provided favorable testimony.

To help ensure our adversarial system produces just results, the Sixth Amendment to the U.S. Constitution guarantees a criminal defendant the effective assistance of counsel. *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See United States v. Freeman*, 24 F.4th 320, 326 (4th Cir. 2022). That test requires the petitioner to show that (1) their counsel's performance was deficient and (2) they were prejudiced by the deficient performance. *Id.* Ultimately, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To satisfy the deficient performance prong, a petitioner must demonstrate that their attorney's performance fell "below an objective standard of reasonableness." *Id.* at 688. Performance is evaluated based on "'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Strickland*, 466 U.S. at 690); *see Carthorne*, 878 F.3d at 465. The "first prong sets a high bar." *Buck v. Davis*, 580 U.S. 100, 118 (2017).

To satisfy the prejudice prong in the context of trial representation, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

20

proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In evaluating whether the petitioner has satisfied the two-pronged test in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Because failing either prong is fatal to a petitioner's claim, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*

Whether to introduce witness testimony is a classic example of trial strategy for which an attorney has broad discretion. *See United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) (explaining that the "decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney" (quoting *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008)); *see also United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (noting that "'whether to call a defense witness is a strategic decision' demanding the assessment and balancing of perceived benefits against perceived risks, and one to which '[the court] must afford . . . enormous deference'" (quoting *United States v. Kozinski*, 16 F.3d 795, 813 (7th Cir. 1994))).

### 1. Desia Holt

In her postconviction petition, Nwoga challenged counsel's failure to call Desia Holt as a witness at trial. ECF 10-1, at 471–72. Nwoga testified at the postconviction hearing that Holt was the anonymous caller who made the complaint spawning the investigation against Poplar Grove Pharmacy. ECF 10-12, at 29. According to Nwoga, Holt would have testified that she never made the call and that her complaint was about a methadone clinic, not Poplar Grove Pharmacy. *Id.* at 30. Nwoga's trial counsel, Karceski, testified at the same hearing. He said that Nwoga believed there was a "conspiracy to set her up and this whole thing about Ms. Holt was just contrived[,] that

21

it wasn't true and they made it up just to get her." *Id.* at 91–92. Karceski testified that he did not believe Nwoga's conspiracy theory, and even if it was true, it was unrelated to whether Nwoga filled fake prescriptions "on so many occasions." *Id.* at 92.

The postconviction court considered this testimony and concluded that it was reasonable trial strategy for Nwoga's counsel to forgo calling Holt as a witness at trial. ECF 10-1, at 505–06. Particularly, the postconviction court found that Holt's testimony had limited probative value because she could only testify about whether she made the call reporting the pharmacy. *Id.* at 506.

Trial counsel's strategic decision not to call Holt is entitled to deference. Moreover, counsel's performance was not deficient because it was reasonable for counsel to decide not to call a witness whose testimony was not relevant to the charges against Nwoga. Likewise, there was no prejudice from the decision because Holt's testimony would not have created a reasonable doubt as to Nwoga's guilt, in light of the substantial evidence against her. The postconviction court's conclusion that counsel was not ineffective is not contrary to or an unreasonable application of *Strickland.*

### 2. Antoinette Johnson

In her postconviction petition, Nwoga also challenged counsel's failure to call Antoinette Johnson as a witness at trial. ECF 10-1, at 475–77. Nwoga testified at the postconviction hearing that Johnson was a customer of Poplar Grove Pharmacy who represented herself to be an employee of Total Healthcare. ECF 10-12, at 38. Nwoga believed that Johnson would have testified at her trial that Nwoga verified the prescriptions Johnson filled at the store, which made up seventy percent of the charges. *Id.* at 39. Karceski testified that he "had no reason to call" Johnson because "she was the lead person in this whole issue of fake prescriptions. From her sprang many other people who came to the pharmacy with bad prescriptions." *Id.* at 87.

22

The postconviction court considered this testimony and concluded that it was reasonable trial strategy for Nwoga's counsel to forgo calling Johnson as a witness at trial. ECF 10-1, at 505, 507. The postconviction court concluded that Johnson's purported testimony would have undermined Nwoga's defense because it showed Nwoga knew how to identify fraudulent prescriptions, and it would not have changed the outcome of the trial considering the overwhelming evidence of guilt. *Id.* at 506.

Trial counsel's strategic decision not to call Johnson is entitled to deference. Counsel's performance was not deficient. It was reasonable for counsel to choose not to call a witness whose testimony could have supported a finding that Nwoga could identify fraudulent prescriptions. The decision certainly did not harm Nwoga. If anything, counsel's decision helped her avoid prejudicial testimony. The postconviction court's conclusion that counsel was not ineffective was not contrary to or an unreasonable application of *Strickland.*

### 3. Darnella Carter

Nwoga also challenged counsel's failure to call Darnella Carter as a witness at trial. ECF 10-1, at 470–71. Nwoga testified that Carter was a customer at Poplar Grove Pharmacy. ECF 10-12, at 25. Nwoga believed that Carter would have testified that the prosecutors "were, to quote [Carter], 'were harassing' her and tried to put words in her mouth." *Id.* at 26–27. According to Nwoga, Carter "was mentioned in [Nwoga's] case," and the prosecutors "told her so many times to say all kinds of lies or say whatever she can tell about [Nwoga], and threatened to take her medical assistance and put her in jail if she [didn't] say what they want[ed] her to say." *Id.* at 25–26. Nwoga states that she brought Carter to meet with her attorneys and "Karceski said he believed her, that she is telling the truth, that he is going to call her as a witness." *Id.* at 26.

23

Pascale testified at the postconviction hearing that Carter was charged along with Nwoga with conspiracy to distribute CDS, but the two cases were severed for trial because Carter did not have counsel. *Id.* at 68.

Karceski testified at the hearing that he thought Nwoga's belief that Carter would be a helpful witness was "totally inaccurate." *Id.* at 86. Karceski stated that, the second time Carter met with the Attorney General's Office, she admitted to passing forged prescriptions and said that Nwoga helped her prepare them. *Id.* at 86.

Schulman testified at the hearing that Carter filled over $100,000 in prescriptions at the pharmacy and was in contact with Nwoga repeatedly by phone, which was a red flag and a reason not to call her as a defense witness. *Id.* at 113. Schulman testified that there was also a question about whether Nwoga had convinced Carter to write a favorable letter to an investigator. *Id.* at 114.

On cross-examination at trial, Nwoga admitted that Carter was paid to work at the pharmacy for two days. ECF 10-7, at 77–78. She also admitted to paying Carter $350 to get proof that a physician accepted CDS in an effort by Nwoga to prove investigators wrong. *Id.* at 117–18. The trial court granted the defense's motion for a judgment of acquittal on the count of conspiracy to distribute CDS because no evidence was offered to prove that count. ECF 10-6, at 10.

The postconviction court considered the trial and postconviction hearing testimony and concluded that it was a reasonable trial strategy for Nwoga's counsel to forgo calling Carter as a witness at trial. ECF 10-1, at 505–06. The postconviction court noted that Carter was indicted at the time of Nwoga's trial, and there was no proof that she would have offered any exculpatory testimony. *Id.* at 505–06.

Trial counsel's strategic decision not to call Carter is entitled to deference. Counsel's decision benefited Nwoga. The absence of Carter's testimony about her repeated contacts with Nwoga and her work preparing prescriptions with Nwoga helped Nwoga's counsel secure an acquittal on the conspiracy charge and avoid testimony that would have helped the state's case against her. Moreover, any limited probative value the witness's testimony might have had also could have undermined Nwoga's defense that she was unaware of the fraudulent activity at her pharmacy. Counsel's decision not to call Carter as a witness was reasonable. Once again, if anything, counsel's decision protected Nwoga from damaging testimony. The postconviction court's conclusion that counsel was not ineffective is not contrary to or an unreasonable application of *Strickland.*

### 4. DEA Agents

In her postconviction petition, Nwoga challenged counsel's failure to call the DEA agents as witnesses at trial, ECF 10-1, at 474–75. At the postconviction hearing, Nwoga testified that DEA Agent Glenn Hester came to her store for her help because she kept "excellent records." ECF 10-12, at 36. Nwoga also testified that Agent Hester sent a confidential informant to her pharmacy to fill a prescription and he knew that Nwoga called to verify it because he answered the call. *Id.* Nwoga testified that Agent Thomas Adams would have testified that the DEA's informant, Antoinette Johnson, was compromised because she was selling prescriptions. *Id.* at 41. And, Nwoga testified that Agent Brian Stine would have testified that Nwoga verified prescriptions and contacted him when she suspected a fraudulent prescription. *Id.* at 35, 37.

Karceski testified at the postconviction hearing that he obtained the names of the DEA agents late in the process. *Id.* at 93. Karceski also testified that he had trouble locating the agents because one had retired and the other two did not respond to his attempts to reach them. *Id.* at 95–

96. Karceski testified that he did not want to request a continuance to try to track down these witnesses because the trial judge (Nwoga had opted for a bench trial) was favorable and he feared that a continuance to secure the agents' appearance at trial would risk losing the favorable judge. *Id.* at 96.

At trial, Nwoga testified on direct examination that on September 12, 2012, she turned over three fraudulent prescriptions she discovered to Agent Stine. ECF 10-6, at 64–65. Nwoga also testified that in February of 2013, she met with Agent Hester and assisted him with an investigation by identifying a patient. *Id.* at 66–67.

The postconviction court considered this testimony and concluded that it was reasonable trial strategy for Nwoga's counsel to forgo calling the DEA agents as witnesses at trial. ECF 10-1, at 505–06. The postconviction court found that testimony from the DEA agents would have undermined the defense theory that Nwoga had no knowledge of fraudulent activity. *Id.* at 506.

Trial counsel's strategic decision not to call these DEA agents as witnesses is entitled to deference. The record reflects that once again, counsel's decision helped rather than hurt Nwoga's defense. The agents' testimony would have helped, rather than undermined, the state's case. Any limited probative value the witnesses' testimony could have had also could have undermined Nwoga's defense that she was unaware of the fraudulent activity at her pharmacy. The postconviction court's conclusion that counsel was not ineffective is not contrary to or an unreasonable application of *Strickland.*

Nwoga's petition for habeas relief based on ineffective assistance of counsel (Ground 3) is denied.

**V.      Certificate of Appealability**

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires the issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court dismisses a habeas petition on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Nwoga's pleadings fail to demonstrate that a certificate of appealability should issue. Nwoga may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

27

A separate order dismissing the procedurally defaulted claims, denying the remaining claims, and denying a certificate of appealability follows.

 March 27, 2026
_____
Date

_____
Deborah L. Boardman
United States District Judge